**AMERICAN SPEEDY PRINTING CENTERS, INCORPORATED,**
Plaintiff–Appellee,

v.

**AM MARKETING, INCORPORATED;** dba American Speedy Printing Centers of Springfield; Mary K. Bennett; Allen F. Bennett, Defendants–Appellants.

No. 01–2123.

United States Court of Appeals,
Sixth Circuit.

July 8, 2003.

Before BATCHELDER and ROGERS, Circuit Judges; and BARZILAY,* Judge.

BATCHELDER, Circuit Judge.

Defendants-appellants AM Marketing, Inc., Mary Bennett, and Allen F. Bennett (collectively "AM Marketing") appeal the district court's order granting summary judgment in favor of substitute plaintiff-appellee Allegra Network, LLC ("Allegra"), the successor-in-interest to American Speedy Printing Centers, Inc. ("ASPC"), on ASPC's claims against AM Marketing for breach of contract and Lanham Act violations, seeking injunctive and monetary relief in the form of past due royalties and associated fees, lost and future profits/royalties, damages allowed under the Lanham Act, an enhancement of Lanham Act damages, and costs and attorneys' fees. The district court concluded that the defendants failed to establish a genuine issue of material fact as to the amount of past due royalties, that the plaintiff was entitled to lost or future profits/royalties, and that the plaintiff was entitled to relief under the Lanham Act. For the reasons that follow, we AFFIRM in part, REVERSE in part. and REMAND for further proceedings consistent with this opinion.

## BACKGROUND

*Factual History*

In 1988, AM Marketing, an Illinois Corporation with its principal place of business in Springfield, Illinois, and ASPC, a Michigan Corporation with its principal place of business located in Troy, Michigan, entered into a franchise and licensing agreement covering the operation of a printing and copying center named "American Speedy Printing Center of Springfield–Southwest." Under the terms of the agreement, which was to last for twenty years, AM Marketing agreed to pay royalties, calculated at 6 percent of total monthly receipts, and a 1 percent monthly advertising fee, in return for the right to use ASPC/Allegra owned trademarks and know-how. The agreement contained a covenant not to compete, defined default and termination, and explained the effect of termination on the franchise relationship.

Section 14(B) of the agreement provided, in pertinent part:

> Franchisor may terminate this Agreement provided the Franchisor allows Franchise Owner thirty (30) days after receipt of notice to cure deficiencies, as more fully described in the notice procedure hereinafter set forth in Paragraph 15 of this Agreement, in the event of any material breach of any terms of this Franchise and License Agreement, including, but not limited to, the following:
>
> (i) failure to make any payment(s) or supply reports required by this Franchise and License Agreement....

Under Section 15(A), "Franchisor shall give Franchise Owner written notice of Notice of Intent to Terminate specifying the reason or reasons for such termination and the date termination will be effective. The date of termination shall be at least thirty (30) days from the date such Notice of Intent to Terminate is postmarked or from the date of personal service, as the case may be." Section 16 governed post

* The Honorable Judith M. Barzilay, Judge for the United States Court of International Trade, sitting by designation.

termination obligations and required AM Marketing, in the event of termination, to pay sums owed to ASPC, cease from using any marks of ASPC, destroy any ASPC materials, cease using the telephone number assigned, and return all ASPC information and communications.

ASPC alleges that AM Marketing failed to report total monthly receipts, as required under the franchise agreement, for the periods February 1996 to November 1996, February 1997, June 1997, July 1997, and December 1997 to December 1999. ASPC also claims that AM Marketing failed to make the required monthly royalty payments for the periods April 1996 to October 1996, February 1997, June 1997, July 1997, and November 1997 to October 1999.

When the plaintiff discovered the defendants' royalty payment deficiencies, ASPC performed a royalty audit for the period of March 1994, through February 1997, and found a delinquency in royalty payments totaling $46,291.72. In a letter dated June 12, 1997, ASPC notified AM Marketing of the deficiencies and provided two repayment options, but neglected to provide any notice of default or termination as specified in the agreement. By including the $900 cost of the audit and an additional arrearage of $10,619.53, ASPC calculated a total amount due of $57,811.24.

More than two years later, ASPC sent AM Marketing a Notice to Cure Default and of Intent to Terminate Franchise and License Agreement. As part of the notice, ASPC described its intent to terminate the agreement if the defaults were not cured within thirty days, as provided in Sections 14 and 16 of the franchise agreement; at the same time, ASPC expressed its desire for defendants to cure the deficiencies and "maintain" the franchise relationship. According to ASPC's calculations. AM Marketing owed $87.828.35 in 1999. AM Mar-

keting admitted receiving this letter but failed to read it until ASPC served them in the present lawsuit six months later. Following ASPC's commencement of this action, AM Marketing continued using the marks associated with the franchise agreement and operating as an ASPC franchise until the close of American Speedy Printing Center of Springfield–Southwest in December of 2000.

*District Court Proceeding*

In support of its motion for summary judgment, Allegra submitted the report of the royalty audit performed on the books and receipts of AM Marketing for the period from March 1994 through February 1997; Allegra's spreadsheets recording AM Marketing's monthly receipts and royalties for the period January 1994 through December 1997, including estimated amounts for those months during that period for which AM Marketing failed to report those figures to Allegra; AM Marketing sales reports for January 1998 through March 2000 produced during discovery by the defendants; and the affidavit of Mark Crowley, Vice–President of Finance of Allegra Network, explaining the royalty audit and describing the basis for Allegra's calculations of royalties due and unpaid. AM Marketing opposed the motion for summary judgment and submitted an affidavit and the deposition testimony from Mary Bennett admitting that AM Marketing was in arrears, but disputing the amount due from the unpaid royalties. According to Ms. Bennett's testimony, the auditors who performed the royalty audit erred by including receipts from AM Marketing's other businesses-not associated with Speedy Printing-in the calculation of unpaid royalties due Allegra, and by using estimated rather than actual receipts in calculating the unpaid royalties. AM Marketing figured the amount due in unpaid royalties actually totaled $16,563.51.

The district court characterized Ms. Bennett's deposition and affidavit as "self-serving" and found them notably lacking in factual support. The court concluded that Crowley's deposition, and the evidence he relied upon, provided sufficient support for Allegra's claim and that AM Marketing failed to establish a genuine issue of material fact. The court granted Allegra's motion for summary judgment and awarded Allegra $55,788.85 for unpaid royalties; the district court also awarded $115,616.12 to Allegra for lost future royalties/profits. Additionally, the court found that AM Marketing became an unauthorized user in 1996 when the defendants failed to pay royalties due under the agreement, and awarded Allegra $417,136.37 for the Lanham Act violations. The district court also enjoined AM Marketing from using any ASPC/Allegra owned trademarks or suggesting that their products were of the type offered for sale by ASPC/Allegra. AM Marketing timely appealed three issues: the calculation of past due royalties, the award of lost future profits/royalties, and the characterization of AM Marketing as an unauthorized user.

## ANALYSIS

### Standard of Review

We review de novo a district court's grant of summary judgment, using the same standard under Rule 56(c) used by the district court, *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir.1999) (en banc), and we consider the record as it stood before the district court at the time of its ruling, *Niecko v. Emor Marketing Co.*, 973 F.2d 1296, 1303 (6th Cir.1992). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). We view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To withstand summary judgment, the non-movant must present sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank.* 916 F.2d 337, 342 (6th Cir.1990). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### A. Past Due Royalties Under the Franchise Agreement

*Allegra's Evidence in Support of its Motion for Summary Judgment*

The district court awarded summary judgment to Allegra in the amount of $55,788.85 for past due royalties under the terms of the franchise agreement. This amount consists of two separate numbers: $24,180.45[1] for past royalties on AM Marketing's gross receipts for the unpaid periods of April 1996 to October

---

1. This figure includes both the 6 percent royalty fee and 1 percent advertising fee based on total sales of $340,949.89

1996, February 1997, June 1997, July 1997, and November 1997 to October 27, 1999, (the date Allegra claims to have terminated the Franchise agreement); and $31,608.40[2] of royalties due and owing pursuant to the April 1997 audit on AM Marketing's unreported receipts for the period of March 1994 to February 1997. These figures were supported by the 1997 royalty audit report itself, Allegra's spreadsheet showing AM Marketing's gross receipts, and the affidavit of Mark Crowley, Allegra's Vice–President of Finance. The unpaid royalties claimed from the close of the audit through the end of 1997 were supported by the Allegra spreadsheets showing AM Marketing's gross receipts and Crowley's affidavit. The unpaid royalties claimed for the years 1998 and 1999 were supported by the gross sales information obtained from the defendants during discovery.

*Sufficiency of Ms. Bennett's Affidavit*

▉ The defendants' sole evidence in opposition to Allegra's motion for summary judgment is an affidavit from Mary Bennett, which specifically disputes the findings of the 1997 royalty audit. First, Ms. Bennett's affidavit attacks the use of "estimated" receipts, rather than actual receipts, for the calculation of past due royalties through February 1997. This argument is meritless. There is no dispute that the evidence necessary to prove the actual sales receipts for the months at issue was control ed by AM Marketing. Since the defendants did not report to Allegra the actual sales receipts for the months in question, Allegra created reasonable estimates from actual sales reported for other months during the audit period, and used those estimates as the basis for calculating unpaid royalties. Ms. Bennett complains that the estimates were not accurate, but she does not argue that no sales receipts existed for the relevant months estimated in the audit and she did not produce any such receipts in opposition to the motion for summary judgment. Ms. Bennett's unsupported allegations are not evidence that the figures relied on by Allegra's auditors are inaccurate or unreliable, and those allegations are not sufficient to create a genuine issue of material fact as to the estimates used in the 1997 royalty audit.

Next, Ms. Bennett alleges that the 1997 audit erroneously comingled receipts from three other businesses operated from the Springfield location. The affidavit specifies the dollar amounts of receipts allegedly attributable to the Bennetts' other businesses for the periods of March 1994 to February 1995, March 1995 to February 1996, and March 1996 to February 1997. but Ms. Bennett provided no documentation to support those assertions. The district court found that the affidavit was "self-serving" and, therefore, insufficient to overcome Allegra's motion for summary judgment.

We agree with the district court that the affidavit was insufficient to create a genuine issue of material fact as to the amount of sales receipts actually attributable to AM Marketing. We do not. however, reach that conclusion because the affidavit was "self-serving." but because under the circumstances of this case, the affidavit was simply inadequate to raise any genuine issue of material fact. Under the Federal Rules of Civil Procedure, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify on the matters

---

**2.** This figure includes only the 6 percent royalty fee based on total unreported receipts of $560,432.68 and adjusted by Michigan's 6 percent sales tax to $526,806.71.

stated therein." FED. R. CIV. P. 56(e). Once a party moving for summary judgment supports its motion with affidavits and other evidence, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided ... must set forth specific facts showing that there is a genuine issue for trial." Id. "Once the moving party presents evidence sufficient to support the motion under Rule 56(c), the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 861 (6th Cir.1986). The nonmoving party must produce significant probative evidence to support its position. Id.

It is true that, as a general rule, in demonstrating that a genuine issue of material fact remains in dispute, the party opposing summary judgment need not produce all–or even much–of the evidence it intends to offer at trial. It must, however, produce significant probative evidence. Here, the only disputed issue of fact is the dollar amount of sales on which the claimed royalties are to be calculated, and the only records which would prove the precise amount are in the defendants' possession. Allegra documented its claims with the evidence of the audits. But Ms. Bennett's affidavit in opposition, while claiming that those audits include receipts from other businesses the Bennetts own and mentioning some specific amounts attributable to those other businesses, is wholly unsupported by any of defendants' records. We think that in a case such as this, where the record reflects no suggestion that the defendants cannot produce the records on which they purport to rely to dispute Allegra's documented claims, the defendants cannot create a genuine issue of fact with regard to these amounts by simply relying on their unsupported affidavit.

It is important to note that Ms. Bennett's affidavit–the only evidence produced by AM Marketing in opposition to the motion for summary judgment–addresses only the past due royalties calculated in the royalty audit. The affidavit does not address Allegra's calculations beyond February of 1997. Accordingly, for the period of time between the end of the audit period and the termination of the franchise agreement, AM Marketing produced *no* evidence countering Allegra's documentation in support of its motion for summary judgment. Accordingly, we affirm the district court's holding that Ms. Bennett's affidavit was insufficient to create a genuine issue of fact as to the amount of past due royalties for the entire period up to the termination of the franchise agreement.

*Calculation*

Although we affirm the district court's holding on this issue, we remand for a more accurate determination of the amount due in unpaid royalties in light of several inconsistencies in the proceedings below. First, in its motion for summary judgment, Allegra provided the district court with the $55,788.85 figure for all unpaid royalties through the date of termination of the franchise agreement in October of 1999. However, when granting the motion for summary judgment, the district court adopted Allegra's final figure, but stated that it covered only AM Marketings' past due royalties owing as of February 1997. Next, we note that several calculations listed in Mark Crowley's affidavit used to compute the $24,180.45 figure, relied upon by Allegra and the district court, are incorrect. For the period of April 30, 1996, through December 31, 1997, the 7 percent fee (1 percent for advertising and 6 percent for royalties) on the $172,856.62 total sales should be $12,099.96, and not

$12,313.92. Additionally, the district court should determine whether Michigan's 6 percent sales tax should be factored into the $24,180.45 calculation, as Allegra did for the under-reported gross receipts of $560,432.68 in the 1997 audit. Finally, we note that Allegra seeks both the 1 percent advertising fee and the 6 percent royalty fee for the unreported receipts listed in Crowley's affidavit, but seeks only the 6 percent royalty fee for the under-reported gross receipts detailed in the audit; the court should determine whether the same percentage fee should be applied to both sets of receipts.

## B. Lost or Future Profits/Royalties Under the Franchise Agreement

■ The defendants appeal the district court's award to Allegra of lost or future profits/royalties under the terms of the franchise agreement. "The goal in awarding damages for breach of contract is to give the innocent party the benefit of his bargain–to place him in a position equivalent to that which he would have attained had the contract been performed." *Tel–Ex Plaza, Inc. v. Hardees Restaurants, Inc.*, 76 Mich.App. 131, 255 N.W.2d 794, 796 (1977). AM Marketing admits that it failed to pay royalties for its use of ASPC/Allegra trademarks and was therefore in breach of the franchise agreement. Accordingly, Allegra is entitled to all damages necessary to be put in a position equivalent to that in which it would find itself if the agreement continued in effect for the full twenty years. Damages for future lost profits "must be subject to a reasonable degree of certainty and cannot be based solely on conjecture or speculation." *Bonelli v. Volkswagen of Am., Inc.*, 166 Mich.App. 483, 421 N.W.2d 213, 226 (1988) (discussing lost future profits in a tortious interference case). "The type of uncertainty which will bar recovery of damages is 'uncertainty as to the fact of

the damage and not as to its amount … [since] where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery.'" *Id.* (citing *Wolverine Upholstery Co. v. Ammerman*, 1 Mich.App. 235, 135 N.W.2d 572, 575–76 (1965)). In its appeal, AM Marketing argues that Allegra's recovery for future profits/royalties is barred by the doctrine of election of remedies and that these damages are too speculative under Michigan law.

### Election of Remedies

Under Michigan law, "the doctrine [of election of remedies] is merely a procedural rule which precludes one to whom there are available two inconsistent remedies from pursuing both. Its purpose is not to prevent recourse to alternate remedies, but to prevent double redress for a single injury." *Riverview Cooperative, Inc. v. First Nat'l Bank & Trust Co. of Mich.*, 417 Mich. 307, 337 N.W.2d 225, 226–27 (Mich. 1983) (internal citations omitted). Three conditions must exist for a court to apply this doctrine: "(1) The existence of two or more remedies; (2) the inconsistency between such remedies; and (3) a choice of one of them." *Id.* at 227. "The doctrine applies only where conflicting and inconsistent remedies are sought on the basis of conflicting and inconsistent rights." *Newman v. Avco Corp.*, 451 F.2d 743, 746 n. 1 (6th Cir.1971).

We agree with the district court and find that Allegra requests consistent remedies. Contrary to the defendants' characterization in this case, Allegra is not attempting to dissolve the franchise agreement through this action and, at the same time, receive damages for lost profits/royalties following that dissolution. It is clear from the plain language of both the franchise agreement and the complaint filed in this action that by the time Allegra filed the

complaint, it had already terminated the agreement in response to AM Marketing's breach. Allegra seeks injunctive relief to stop AM Marketing from using its marks or holding itself out as a franchise owner, and monetary compensation in the form of lost profits/royalties for defendants' actual breach of the agreement that has already occurred–entirely consistent remedies for separate and distinct injuries. This assignment of error is without merit.

*Damages Speculation*

■ On appeal, AM Marketing does not dispute, with any sort of detail, the way in which Allegra calculated the amount of its lost future profits/royalties, but instead contests whether American Speedy Printing Center of Springfield–Southwest would have continued under the franchise agreement, and thus incurred any liability to make *any* future royalty payments. *See Bonelli*, 421 N.W.2d at 226 (noting that uncertainty as to the fact of the damage and not as to its amount will bar recovery). AM Marketing, relying upon *Stevenson v. Brotherhoods Mutual Benefit*, 312 Mich. 81, 19 N.W.2d 494 (Mich.1945), argues that future profits "contingent on opportunity, successful operation, and other uncertain happenings," are simply too speculative. *Id.* at 498. In support of their argument, the defendants refer to Ms. Bennett's somewhat inconsistent affidavit testimony that their printing and copying center had ceased operation on December 31, 2000, and that the Bennetts could not predict the future viability of their business, and were likely to terminate the franchise agreement before the expiration of the twenty year period. This, according to AM Marketing, creates a factual dispute as to the possibilities of future profits/royalties for Allegra. This argument, however, misapplies the legal principles invoked by the defendants. Because the franchise contract does not provide for the termination of the contract by defendants in the absence of a material breach by the franchisor, any unilateral decision by AM Marketing to end the franchise relationship would constitute a breach of the agreement, entitling Allegra to the same future profits at issue in this case. To create uncertainty as to the fact of future profits, therefore, AM Marketing must provide evidence that American Speedy Printing Center of Springfield–Southwest was likely to fail in some way, or become unprofitable, such that sales would end but without any breach of the franchise agreement. AM Marketing's mere suggestion that the continued success of the business was difficult to predict, or even Ms. Bennett's statement that the business had ceased operations, is not sufficient to create uncertainty as to the fact of future profits/royalties.

We agree with the district court that Allegra produced more than sufficient evidence to accurately estimate its lost future profits/royalties and that the $115.616.12 in damages awarded to Allegra was calculated to a reasonable degree of certainty and not based solely on conjecture or speculation. We affirm the district court's award of lost future profits/royalties under the terms of the franchise agreement.

C.  Lanham Act Violations

■ Finally, AM Marketing appeals the district court's determination that the defendants violated sections 32[3] and 43[4] of

---

**3.** Section 32, or 15 U.S.C. § 1114(1), provides, in pertinent part:

Any person who shall, without the consent of the registrant—(a) use in commerce any reproduction, counterfeit, copy, or color-

able imitation of a registered mark in connection with the sale ... or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive

the Lanham Act. "The Lanham Act prohibits the unauthorized use of a registered trademark when selling or advertising a good or service using the trademark is likely to confuse or deceive consumers." *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1188 (6th Cir.1997). To survive summary judgment, AM Marketing "must raise a genuine issue of fact as to (1) whether their use of the trademark was without the registered owner's consent, or (2) whether their unauthorized use was likely to cause confusion in the marketplace as to the origin or sponsorship of the product." *Id.* at 1188–89. In their arguments below and before this court, the defendants contest only the district court's finding that they were an unauthorized user of ASPC/Allegra owned trademarks.

*Unauthorized User*

The district court concluded that AM Marketing became and remained an unauthorized user when it failed to pay royalties under the terms of the franchise agreement, beginning in April of 1996. The court awarded Allegra all of defendants' profits for the periods of unauthorized use, although the court declined to award enhanced damages under the Lanham Act, finding defendants' conduct was not deliberate and willful.[5] Although we agree that AM Marketing was an unauthorized user prior to the close of American Speedy Printing Center of Springfield–Southwest in December of 2000, we find that the district court erred as a matter of law in determining when the defendants' Lanham Act violations began.

We look to state law to determine whether a user has the "consent of the registrant." or is instead unauthorized. Both Allegra and the district court rely upon a Michigan Supreme Court case from 1940 for the proposition that a licensee is an unauthorized user when it fails to pay royalties while simultaneously using the licensed property. *See Rubsam Corp. v. Gen. Motors. Corp.*, 294 Mich. 31, 292 N.W. 554, 558 (1940). In *Rubsam*, a case dealing with patent infringement, the court held that a licensee who did not elect to use patents under a license agreement, but nevertheless, did actually use them without paying royalties as required under the agreement, "would be subject to a suit for infringement of the patent." *Id.* We do not find *Rubsam* controlling in this case. First, the license agreement in *Rubsam*, which required an election by the user prior to actual use for the agreement to be effective, is significantly different from the franchise agreement at issue in this case that was already in effect at the time AM Marketing ceased making royalty pay-

---

... shall be liable in a civil action by the registrant....

4. Section 43, or 15 U.S.C. § 1125(a)(1), provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to

the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

5. Allegra failed to appeal the district court's denial of enhanced Lanham Act damages. Accordingly, we will not consider that portion of the district court's opinion.

ments. Second, no reported case has cited to *Rubsam* in its sixty-plus year history, let alone relied upon its holding to define an unauthorized user under the Lanham Act. Finding no Michigan case defining an unauthorized user under the circumstances presented in this case, we apply general Michigan contract law.

"Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement." *Universal Underwriters Ins. Co. v. Kneeland,* 464 Mich. 491, 628 N.W.2d 491, 496 (2001). The terms and conditions of AM Marketing's franchise agreement were clear and internally consistent. Under the terms of the agreement, AM Marketing was to own a licensed franchise for twenty years unless the franchise was terminated as provided under the terms of the agreement. The franchise agreement provided that in the event of AM Marketing's failure to pay royalties, ASPC had the right to terminate the agreement if, thirty days after receiving written notice from ASPC to cure the deficiency ("Notice of Intent to Terminate"), AM Marketing failed to do so. The agreement required that upon its actual termination. AM Marketing must "cease doing business under the trade names, trademarks, and service marks" licensed through the franchise agreement. Accordingly, under the plain language of the franchise agreement, until the agreement was terminated according to its explicit terms, AM Marketing was not an unauthorized user.

Both parties concede that ASPC sent the required Notice of Intent to Terminate on or about September 27, 1999. Ms. Bennett admits that she received the notice sometime following September 27, but claims that she did not read it until March of 2000. Ms. Bennett also testified in her deposition that, following her receipt of the notice, ASPC employees contacted her to discuss franchise business. Although the defendants failed to read the notice and the plaintiff continued to communicate with the defendants about continuing the franchise business, the defendants did not cure the arrearage in payment of royalties within the thirty day period provided in the agreement. We therefore conclude that as a matter of law, AM Marketing became an unauthorized user thirty days after September 27, 1999. We remand for recalculation of the Lanham Act damages for the period between ASPC's termination of the franchise agreement and the close of American Speedy Printing Center of Springfield–Southwest in December of 2000.[6]

## CONCLUSION

For the reasons stated above, we AFFIRM in part, REVERSE in part, and REMAND for proceedings consistent with this opinion.

---

**6.** The defendants do not appeal the district court's award of injunctive relief under the Lanham Act. Having affirmed the district court's holding that AM Marketing was an unauthorized user, we affirm the award of injunctive relief under the Act. Neither do the defendants appeal the award of injunctive relief under the franchise agreement, and we do not address that award.